Elizabeth J. Cabraser (State Bar No. 083151)
*ecabraser@lchb.com*
Lexi J. Hazam (State Bar No. 224457)
*lhazam@lchb.com*
Sarah R. London (State Bar No. 267083)
*slondon@lchb.com*
Tiseme G. Zegeye (State Bar No. 319927)
*tzegeye@lchb.com*
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

*Attorneys for Plaintiffs A.B., C.D., and E.F. and*
*Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.B., C.D., and E.F., individually and on behalf of all others similarly situated, | Case No.  3:18-cv-2298 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | 1.   Negligence and/or Gross Negligence; |
| PACIFIC FERTILITY CENTER, and PRELUDE FERTILITY, INC., | 2.   Negligent Infliction of Emotional Distress; |
| Defendants. | 3.   Breach of Contract; |
| | 4.   Conversion; |
| | 5.   Bailment; |
| | 6.   Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; and |
| | 7.   Premises Liability. |
| | **DEMAND FOR JURY TRIAL** |

Plaintiffs A.B., C.D., and E.F., ("Plaintiffs"), on behalf of themselves and all other similarly situated individuals, file this action against Defendants Pacific Fertility Center ("Pacific Fertility Center" or "PFC") and Prelude Fertility, Inc. ("Prelude").

**INTRODUCTION**

1.      This Class Action is brought by Plaintiffs on behalf of themselves and a Class of persons, asserting injury and seeking relief from a single incident, on Defendants' premises, that irreparably harmed those who entrusted Defendants with their eggs and embryos for preservation and safekeeping.

2.      Plaintiffs and class members entrusted Defendants with safeguarding their frozen eggs and embryos to preserve their reproductive options.  On March 4, 2018, Defendants became aware that the temperature was too high in a storage tank containing Plaintiffs' and the other class members' eggs and embryos.  It was not until a week later, on March 11, 2018 at 4:00 am, that Plaintiffs and other class members received a boilerplate email from Pacific Fertility Center stating that a failure in a storage tank known as "Tank 4" may have damaged thousands of frozen eggs and embryos, affecting more than 400 families.[1]

3.      Defendants' breach of Plaintiffs and other class members' trust through their gross mishandling of eggs and embryos has caused panic, confusion, anxiety, devastation, and irreparable damage to hundreds of prospective parents and families.

4.      Adding insult to injury, since the incident, Pacific Fertility Center has not taken appropriate affirmative efforts to provide clear, consistent communication to those affected or offer support services.  Instead, Plaintiffs and class members have received vague and often conflicting information from different staff members, leaving victims confused and even more anxious, during an already emotionally difficult time.

5.      Plaintiffs, individually and on behalf of the other class members who entrusted Defendants to store the eggs and/or embryos that were in Tank 4, seek damages, equitable relief, and other remedies from Defendants as a result of their misconduct.

---

[1] Some class members apparently did not receive an email, but instead learned about the tank failure from a news article or on social media.

**JURISDICTION AND VENUE**

6.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because (a) Plaintiffs are citizens of a state different from Prelude, (b) the amount in controversy exceeds $5,000,000, excluding interest and costs, (c) the proposed class consists of more than 100 individuals, and (d) none of the exceptions under the subsection applies to this action.

7.     This Court has personal jurisdiction over Defendants.  They conduct substantial business in this District and intentionally availed themselves of the laws and markets of this District.  A significant portion of the acts and omissions complained of occurred in the District, and Plaintiffs and many class members suffered harm in the District.

8.     Venue is proper in this District under 28 U.S.C § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

**INTRADISTRICT ASSIGNMENT**

9.     Assignment to the San Francisco Division or Oakland Division is proper under Local Rules 3-2(c) and (d), because a substantial part of the events or omissions giving rise to the claims occurred in San Francisco County.

**PARTIES**

10.     At all relevant times, Plaintiff A.B. was a citizen and resident of San Francisco County, California.  Plaintiff A.B. is using initials (not hers) in this litigation to protect her privacy, and if required by the Court, will seek permission to proceed under this pseudonym.

11.     At all relevant times, Plaintiff C.D. was a citizen and resident of San Francisco County, California.  Plaintiff C.D. is using initials (not hers) in this litigation to protect her privacy, and if required by the Court, will seek permission to proceed under this pseudonym.

12.     At all relevant times, Plaintiff E.F. was a citizen and resident of San Mateo County, California.  Plaintiff E.F. is using initials (not his) in this litigation to protect his privacy, and if required by the Court, will seek permission to proceed under this pseudonym.

13.     Defendant Pacific Fertility Center is a private unincorporated entity located at 55 Francisco Street, Suite 500, San Francisco, California 94133.

14.     At all relevant times, Defendant Prelude Fertility, Inc. was a privately-held Delaware corporation headquartered in Florida.

15.     On information and belief, Prelude has owned and operated Pacific Fertility Center since September 2017.

16.     The true names, capacities or involvement of the manufacturers, and/or suppliers, and/or distributors, and/or others responsible for the design, operation, and/or maintenance of Tank 4 and its components, as well as related cryogenic preservation equipment, including, but not limited to, its alarm system and back-up generators, are unknown to Plaintiffs.  Upon discovery and if it would appropriate to do so, Plaintiffs will move to amend to add these entities.

17.     Nonetheless, the named Defendants are jointly and severally liable for the entire harm for the breach of their non-delegable duty to Plaintiffs and the class.

18.     At all times herein mentioned, each and every of the Defendants herein was the agent, servant, partner, joint venturer, employee and/or franchisee of each of the other Defendants, and each was at all times acting within the course and scope of such agency, service, employment, joint venture, partnership and/or franchise.

## FACTUAL ALLEGATIONS

19.     Defendants Prelude and PFC market and provide fertility services including egg retrieval, egg, embryo and sperm freezing, genetic testing, embryo creation, and embryo transfer/implantation.

**A.     Prelude Fertility**

20.     Prelude, a reproductive science and technology company, operates a national network of fertility clinics and egg donation centers offering in vitro fertilization (IVF), genetic screening, and egg and embryo freezing, storage, and donation services.

21.     Prelude was founded in 2016 after receiving a $200 million investment by New York-based Lee Equity Partners.

22.     Prelude acquired Pacific Fertility Center in September 2017 and directs visitors to its website to contact PFC.

23.     Along with Pacific Fertility Center, the "Prelude Network" includes Reproductive

Biology Associates of Atlanta, My Egg Bank North America, and the Vivere Health clinics.

24.     Prelude markets and provides their "Prelude Method," a four-step process that includes egg and sperm freezing, genetic testing, embryo creation, and single-embryo transfer.

25.     Prelude represents that its egg and embryo freezing and storage services are successful: "The Prelude Method can dramatically increase the probability of having a healthy baby and decrease the chances of requiring infertility therapy later in life"[2] and "women of any age who use frozen young eggs from our partner egg bank, MyEggBank North America, have a ~90% cumulative pregnancy success rate after three cycles."[3]

26.     Prelude represents that its egg and embryo freezing and storage services are safe: "Eggs can be safely stored for as long as you need them. There is no current evidence that suggests they deteriorate with time, so you can take as long as you need to prepare for your future family"[4] and "Set it and forget it until you're ready. When you are ready to start your family, frozen eggs are thawed and combined with sperm to create embryos."[5]

27.     Prelude directs those who visit its website to Pacific Fertility Center for egg and embryo freezing services, specifying that it is the "[l]eading provider of egg freezing services in the Bay Area."[6]

**B.     Pacific Fertility Center**

28.     Pacific Fertility Center is a San-Francisco-based fertility clinic founded in 1999 and acquired by Prelude in September 2017.

29.     Pacific Fertility Center states that "Fertility is a precious resource, limited to just a few years of your life" and claims "Egg freezing, however, allows you to save some of your youthful fertility resources for later use. This risk-reduction strategy can increase your chances of

---

[2] https://www.preludefertility.com/press-release/lee-equity-partners-martin-varsavsky-reproductive-biology-associates-egg-bank-north-america-launch-prelude-revolutionize-way-people-start-family.

[3] https://preludefertility.com/faq.

[4] https://preludefertility.com/faq.

[5] https://preludefertility.com/faq.

[6] https://preludefertility.com/clinics.

conception by 5 to 10 times."[7]

30.    Pacific Fertility Center preserves retrieved eggs through a rapid freezing process called "vitrification."  Pacific Fertility Center's first cycle of egg freezing, retrieval, and storage for a year costs $8,345.  Subsequent cycles cost $6,995 each.  The new patient consultation costs $375, egg retrieval medications range from $2,000 to $6,000, lab work requires additional fees, and tissue storage costs $600 per year.

31.    Pacific Fertility Center represents that its egg and embryo freezing and storage services are successful: "At Pacific Fertility Center, the egg recovery rate after vitrification and later thawing is 83 percent, and fertilization rate is 84 percent"[8], and its use of vitrification "successfully protects the embryos from damage and allows them to be warmed later giving survival rates consistently above 90%."[9]

32.    Pacific Fertility Center represents that its egg and embryo freezing and storage services are safe:  "there is no limit to how long cells remain viable in the frozen state.  We have had some patients return to thaw embryos after more than 10 years and the embryos were no different than when they were frozen.  The temperature of liquid nitrogen is so cold that scientists think that all biological activity is stopped and that there are no issues with very long term storage."[10]

33.    "Emotional health" and "well being" are central to PFC's care, and PFC undertakes a "whole patient approach":

> We are dedicated to a whole patient approach. We recognize that fertility treatment may impact all corners of our patient's lives, including work, personal relationships and financial concerns. When designing their treatment course, our physicians, nurses and counselors work with them to accommodate all of these considerations.
>
> Our support is integrated. Emotional health and well being are central to our patient's care. Our clinic's services include acupuncture and an array of Mind/Body and stress reduction workshops, seminars and support groups. Our in-house family

---

[7] https://www.pacificfertilitycenter.com/fertility-preservation/my-eggs#assessment.
[8] https://www.pacificfertilitycenter.com/fertility-preservation/my-eggs#success.
[9] https://www.pacificfertilitycenter.com/treatment-care/vitrification.
[10] https://www.pacificfertilitycenter.com/treatment-care/sperm-and-embryo-freezing.

therapist is available to any patient and will also gladly provide referrals to other qualified professionals. Our genetics counselor consultant can help our patients understand their genetic history and how this may factor into their treatment options.[11]

Further, PFC undertakes to address clients' "emotional and even spiritual needs" as part of their journey through the "emotional ups and downs" of infertility:

At PFC, we know that the physical demands and emotional ups and downs of infertility experience can impact life at home, at work and with family. This is a path that one likely did not anticipate and, while there is much reason for hope, the treatment process can also be emotionally trying. The well being of our patients is a crucial aspect of fertility treatment, and we encourage our patients to take advantage of the many resources we have developed to address the emotional and even spiritual needs they may have as a part of their journey.

PFC's extensive support system includes a devoted patient care team, experienced clinical coordinators and educators and an in-house marriage and family therapist who has long specialized in fertility and third party parenting issues. Each of our physicians has his or her own team that will then work with each patient. We do try to get to know our own patients as much as possible in the (hopefully short) time they are working with us in their attempts to conceive. We all feel grateful to work in a rewarding field that allows us to help our patients build their families and have a positive impact on the lives of so many people.[12]

34.     Acknowledging the stress and challenges faced by those undergoing IVF, PFC promises to be "by their side every step of the way":

A diagnosis of infertility can feel overwhelming and stressful for individuals and couples who always assumed that pregnancy would come easily. At Pacific Fertility Center, we see infertility as a workable challenge.

It is our commitment to address our patient's unique set of circumstances, medical as well as non-medical. Our physicians, counselors and staff consider patient care a team effort involving superior medical treatment and ground-breaking technology in an environment that emphasizes a compassionate, whole patient approach.

We feel strongly that the physical well being is tied to emotional well being, and we take into account all of the challenges patients may be facing. Diagnosis, treatment and the inevitable 'waiting game' as well as financial stress all may impact our patients and those closest to them. We are by their side every step of the way to

---

[11] https://www.pacificfertilitycenter.com/treatment-care/fertility-treatment-and-care.

[12] https://www.pacificfertilitycenter.com/treatment-care/patient-support.

CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-2298

1    help address each and all of these needs.[13]

2    **A.      Plaintiffs Entrust Pacific Fertility Center with Genetic Material**

3         **1.      Plaintiff A.B.**

4    35.    In late 2015, Plaintiff A.B. contracted with Defendants to have her eggs preserved

5    for future reproductive use.  Based on information provided by PFC regarding success rates, she

6    underwent three retrieval cycles, resulting in 17 eggs. The five eggs retrieved during her first

7    cycle were stored in Tank 4.

8    36.    Plaintiff A.B. incurred significant costs in the retrieval and egg storage, in excess

9    of $30,000.  The process was time-consuming, burdensome on her body, and emotionally

10   challenging.  But ultimately, she believed that the process was worth it, because, as PFC stated in

11   its marketing, she could rest easier knowing that she had taken measures toward her goal of

12   having children when the time was right.

13   37.    Plaintiff A.B. has regularly and timely paid the fees for continued cryopreservation

14   and storage of the eggs.

15        **2.      Plaintiffs C.D. and E.F.**

16   38.    In 2012, Plaintiff C.D. contracted with Defendants to have her eggs preserved for

17   future reproductive use.  Based on information provided by PFC regarding success rates given her

18   age and reproductive goals, she underwent approximately three retrieval cycles, resulting in

19   approximately 37 eggs.  In 2016, C.D. contracted with Defendants to fertilize half of her eggs

20   with a sperm donor, resulting in three high quality embryos, plus a fourth embryo of unknown

21   quality.[14]  As she later learned, all of her remaining eggs (15) were stored in Tank 4.

22   39.    C.D. and E.F. are in a committed relationship and plan to raise children together.

23   In December 2017, E.F. also became a client of PFC, when C.D. and E.F. consulted with PFC to

24   begin the process of fertilizing C.D.'s remaining eggs with E.F.'s sperm.  In consultation with

25   PFC specialists, C.D. and E.F. decided to plan for the fertilization to occur by June 2018.

26

27   [13] https://www.pacificfertilitycenter.com/the-center/infertility-center.
     [14] PFC told C.D. that several vials cracked and/or malfunctioned during this thawing and
28   fertilization process, destroying approximately five of her eggs.

40.     Plaintiff C.D. incurred significant costs in the retrieval and egg storage, in excess of $25,000.  The process was time-consuming, burdensome on her body, and emotionally challenging.  But ultimately, she believed that the process was worth it, because, as PFC stated in its marketing, she could rest easier knowing that she had taken measures toward her goal of having children with her preferred partner when the time was right.

41.     Plaintiff C.D. regularly and timely paid the fees for continued cryopreservation and storage of the remaining eggs.  PFC accepted her most recent payment the week after the Tank 4 failure occurred, but before PFC notified her and others regarding the incident.

42.     At all relevant times thereafter, Plaintiffs' eggs were under Defendants' protection, custody, and control.  Defendants kept Plaintiffs' eggs frozen within a steel storage tank containing liquid nitrogen at their San Francisco laboratory facility on Francisco Street.

43.     Thousands of frozen eggs and embryos belonging to more than 400 patients were stored in the same tank.

44.     On information and belief, PFC does not have a policy or practice to place patient's eggs or embryos in different tanks to ensure that at least some tissue would be safe in the event that one tank fails.

45.     In other words, it appears that for a given IVF round, PFC stores all of a patient's eggs in the same proverbial basket.

46.     PFC promised to dispose of Plaintiffs and class members' embryos in strict accordance with their written instructions, which may include donating them to research or to other families struggling with fertility.

**B.      Defendants' Storage Tank Four Fails**

47.     Pacific Fertility Center stores eggs and embryos in cryogenic tanks.  These tanks consist of metal welded into an inner and outer tank to create a vacuum seal. Liquid nitrogen added to the tank maintains the low temperatures that keep eggs and embryos frozen.

48.     On March 4, 2018, Pacific Fertility Center discovered a problem with the liquid nitrogen in one of its cryogenic storage tanks, Tank 4.  After finding the problem during a routine check, a senior embryologist refilled the tank and then later transferred the contents to another

1    tank.

2        49.    It is not known how long the nitrogen level had dropped to unsafe levels in Tank 4

3    before the problem was discovered.

4        50.    Pacific Fertility Center did not notify Plaintiffs and class members until March 11,

5    2018 at 4:00 am, when it acknowledged in a boilerplate email that the storage tank failure may

6    have damaged thousands of frozen eggs and embryos, affecting more than 400 families.

7        51.    On March 11, 2018, Plaintiff A.B. learned for the first time that five of her eggs

8    were impacted by the failure in Tank 4.  She was told that PFC could not know for certain

9    whether any of the eggs were totally destroyed until they were thawed and fertilized.  Since re-

10   freezing and re-thawing would add additional risks to the health of the embryos, she was told that

11   once an egg was thawed and fertilized, she would have to also be prepared to go through with an

12   IVF transfer at that that time.  In other words, to determine whether her eggs remained viable

13   despite having been exposed to unsafe conditions, she would have to actually go ahead and try to

14   get pregnant with those eggs or hire a surrogate to do so.  She is left in a fog of uncertainty,

15   anxious about whether and how she should proceed to preserve her reproductive future.  She also

16   feels pressure to move forward with another round of retrievals to try to mitigate her loss, and

17   stress related to the significant additional cost, burden and uncertainty from further IVF rounds.

18       52.    On March 11, 2018, Plaintiffs C.D. and E.F. learned for the first time that all of

19   C.D's remaining eggs (15) were impacted by the failure in Tank 4.  They were later told by PFC

20   it would be uncertain whether any of the eggs were totally destroyed until they were thawed and

21   fertilized.  Like A.B., C.D. and E.F. were told that once an egg was thawed and fertilized by E.F,

22   they would have to also be prepared to go through with an IVF transfer at that that time.  In other

23   words, to determine whether C.D.'s eggs remained viable despite having been exposed to unsafe

24   conditions, they would have to actually go ahead and try to get pregnant with those eggs or line

25   up a surrogate to do so—untenable options that would entail considerable cost and risk, and

26   would be fraught with fear, stress, anxiety, and likely heartache.  C.D. entrusted PFC with storing

27   her eggs, so that she could plan to have a family when she met the right partner.  PFC betrayed

28   that trust, leaving her devastated and heart-broken, as she likely has been deprived the

1    opportunity to have a biological child with her significant other, E.F.  At 45, C.D. understands

2    that she is no longer a candidate for further egg retrievals, given the unfavorable success rates and

3    heightened risks to her health.  Further, to preserve E.F.'s ability to have a biological child, he

4    would likely have to obtain donor eggs, incurring considerable additional monetary and emotional

5    costs.

6         53.    PFC has not publicly disclosed what caused the tank malfunction.

7         54.    On information and belief, there was a crack in Tank 4 that allowed nitrogen to

8    escape.

9         55.    On information and belief, an alarm system failed.

10         56.    On information and belief, a back-up generator failed.

11         57.    It is not yet known exactly what caused the tank malfunction, why there was no

12    alarm to alert PFC staff, why there was no backup system, such as an autofill function or

13    additional generator, nor why the problem went undiscovered until someone passed through the

14    lab with a clipboard during a routine check.

15         58.    PFC has brought in a third party for a full investigation.

16         59.    Whatever the cause, Defendants grossly failed to have the appropriate systems in

17    place to avoid this catastrophic failure.

18         60.    Defendants' mishandling of the eggs and embryos is irreparable and devastating.

19    Not only is retrieving and freezing eggs an expensive, time-consuming, physically burdensome

20    and often painful process that typically requires time away from work, and can cost

21    approximately $20,000 or more, plus hundreds of dollars in annual storage fees and

22    recommended ancillary treatments (such as medication, acupuncture, and visits to nurses to

23    administer hormone shots, and therapy), the value and importance of the eggs and embryos that

24    Plaintiffs and the other Class members entrusted to Defendants' care, and for which Defendants

25    accepted all legal responsibility to store, preserve, and protect, is extraordinary.  For some

26    victims, the eggs and embryos in Tank 4 were the last and only chance to have a biological child.

27    For those who can undergo additional rounds, they will face a lower chance that those eggs or

28    embryos will lead to a successful pregnancy, as the age at which eggs are retrieved is the most

1   significant factor in determining success rates.

2        61.    IVF requires those undergoing treatment to rely heavily on friends and significant

3   others for support, including coping with stress and providing rides to and from services.[15]

4        62.    PFC well understands how overwhelming its services can be.  According to its

5   website, "the time and energy that is needed, both physically and emotionally can drain even the

6   staunchest crusader."[16]

7        63.    Nevertheless, after the incident, PFC did not offer any additional support services

8   or counseling, even though they have a counselor on staff.  Aside from the boilerplate email, PFC

9   has not sent any further written communication to affected clients.  The information provided

10  over the phone and in person has been vague and often conflicting between different staff

11  members, and inconsistent with what others have been told.  PFC's failure to offer compassionate

12  support services and to communicate clearly and consistently with victims has caused further

13  confusion, pain and distrust.

14       64.    The conduct alleged against Defendants in this complaint was despicable and

15  subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, constituting

16  oppression, for which Defendants must be punished by punitive and exemplary damages in an

17  amount according to proof.  Defendants' conduct evidences a conscious disregard for the safety

18  the eggs and embryos entrusted to them, and by extension, those who placed the eggs and

19  embryos in Defendants' care, including Plaintiffs' and class members.  Defendants' conduct was

20  and is despicable conduct and constitutes malice as defined by Civil Code § 3294.  An officer,

21  director, or managing agent of Defendants personally committed, authorized, and/or ratified the

22  despicable and wrongful conduct alleged in this complaint.  Plaintiffs and the class members are

23  entitled to an award of punitive damages sufficient to punish and make an example of these

24  Defendants.

25                          **CLASS ACTION ALLEGATIONS**

26       65.    This Court may wish to consider procedures to streamline the determination of

27  ───────────────────
[15] *See, e.g.*, https://www.pacificfertilitycenter.com/blog/fertility-resources-your-fingertips.

28  [16] https://www.pacificfertilitycenter.com/blog/fertility-resources-your-fingertips.

common claims on issues in this case, as PFC's misconduct leading to a single incident—the failure in Tank 4—has affected hundreds of people at once.  To facilitate any such efforts through the joint trial of common questions, Plaintiffs propose certification of the following class, pursuant to Rule 23 of the Federal Rules of Civil Procedure:

> All persons who had eggs, embryos, or other human reproductive
> tissue stored in Pacific Fertility Center's San Francisco laboratory's
> Tank 4 on March 4, 2018.

66.     Excluded from the Class are Defendants, their affiliates and subsidiaries, and their officers, directors, partners, employees, and agents; Class counsel, employees of Class counsel's firm, and Class counsel's immediate family members; defense counsel, their employees, and their immediate family members; and any judicial officer who considers or renders a decision or ruling in this case, their staff, and their immediate family members.

67.     <u>Numerosity</u>.  The members of the class are so numerous that their individual joinder is impracticable.  There are at least 400 class members, whose names and addresses are readily available from Defendants' records.

68.     <u>Existence and Predominance of Common Questions of Fact and Law</u>.  This action involves common questions of law and fact that predominate over any questions affecting individual class members, including, without limitation:

a.     What caused Tank 4 to fail;

b.     Whether Defendants owed a duty to Plaintiffs and class members to protect the eggs and embryos entrusted to Defendants' care;

c.     Whether that duty was non-delegable;

d.     Whether Defendants breached their duties to protect the eggs and embryos that Plaintiffs and class members entrusted to their care;

e.     Whether the March 4, 2018, loss of liquid nitrogen at a tank in Defendants' San Francisco facility resulted from Defendants' negligence or other wrongful conduct;

f.     Whether Defendants failed to take adequate and reasonable measures to ensure that their systems were protected;

1         g.      Whether Defendants failed to take available steps to ensure that liquid

2   nitrogen levels in their storage tanks would remain sufficient;

3         h.      Whether Defendants breached their contracts with Plaintiffs and class

4   members;

5         i.      Whether Defendants' conduct renders them liable for negligence, gross

6   negligence, bailment, conversion, unfair competition, premises liability, and/or breach of

7   contract;

8         j.      The type(s) and measure(s) of compensable and other redressable injury

9   categorically incurred by the Class as a result of Defendants' conduct; and

10         k.      What measures are necessary to ensure that eggs and embryos stored at

11   PFC are properly safeguarded in the future.

12      69.   <u>Typicality</u>.  Plaintiffs' claims are typical of the other class members' claims

13   because Plaintiffs and class members were subjected to the same wrongful conduct and damaged

14   in the same way by having their human reproductive tissue destroyed.

15      70.   <u>Adequacy of Representation</u>.  Plaintiffs are adequate class representatives.  Their

16   interests do not conflict with the interests of the other class members they seek to represent.

17   Plaintiffs have retained counsel competent and experienced in complex class action litigation, and

18   they intend to prosecute this action vigorously.  Plaintiffs and their counsel will fairly and

19   adequately pursue and protect the interests of the class.

20      71.   <u>Superiority</u>.  A class action is superior to all other available means for the fair and

21   efficient adjudication of this controversy.  The damages or other financial detriment suffered by

22   Plaintiffs and the other class members are relatively small compared to the burden and expense

23   that would be required to individually litigate these claims.  As a result, it would be impracticable

24   for class members to seek redress individually.  Individualized litigation would also create a

25   potential for inconsistent or contradictory judgments and increase the delay and expense to all

26   parties and the court system.  By contrast, the class action device presents far fewer management

27   difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive

28   supervision by a single court.

## FIRST CLAIM FOR RELIEF
### Negligence and/or Gross Negligence

72.     Plaintiffs incorporate the above and below allegations by reference.

73.     Defendants owed Plaintiffs and class members a duty to exercise the highest degree of care when maintaining, inspecting, monitoring, and testing the liquid nitrogen storage tanks used for the preservation of eggs and embryos at Defendants' San Francisco laboratory.

74.     Defendants owed Plaintiffs and class members a non-delegable duty of care with respect to the maintenance and protection of the eggs and embryos entrusted to their care.

75.     Defendants breached these duties and acted with negligence and gross negligence in at least the following respects:

a.      failing to adequately design, maintain, inspect, monitor, and/or test their liquid nitrogen storage tanks, in accordance with industry standards, including through a functional electronic tank monitoring system capable of detecting a rise in temperature or a drop in liquid nitrogen levels and promptly alerting staff to the immediate problem;

b.      permitting a leakage or tank failure to occur from one of their liquid nitrogen storage tanks containing human eggs and embryos;

c.      failing to have back-up alarm and generator systems;

d.      failing to properly safeguard the human reproductive tissue in its care; and

e.      failing to follow accepted scientific and laboratory procedures for safeguarding the human reproductive tissue in its care.

76.     Defendants' acts and omissions constitute gross negligence, because they constitute an extreme departure from what a reasonably careful person would do in the same situation to prevent foreseeable loss of human reproductive tissue.

77.     Defendants acted willfully, wantonly, and with conscious and reckless disregard for the rights and interests of Plaintiffs and class members.  Defendants' acts and omissions had a great probability of causing significant harm and in fact did.

78.     As a proximate result of Defendants' negligence and/or gross negligence, Plaintiffs and class members suffered harm in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### Negligent Infliction of Emotional Distress

79.     Plaintiffs incorporate the above and below allegations by reference.

80.     Defendants owed a duty of care to Plaintiffs and class members to act reasonably in all aspects of the handling and storage of Plaintiffs and class members' eggs and embryos so as to avoid needlessly causing emotional distress.

81.     Defendants owed Plaintiffs and class members a non-delegable duty of care with respect to the maintenance and protection of the eggs and embryos entrusted to their care.

82.     Defendants carelessly and negligently handled and stored Plaintiffs and class members' eggs and embryos.

83.     Plaintiffs and class members were directly involved in and directly impacted by Defendants' carelessness and negligence, in that Defendants assumed the duty of care to avoid causing emotional distress through communications with patients, through marketing and on their website, and/or because Defendants have a special relationship with Plaintiffs and class members, based on their contractual relationship, and/or the doctor-patient relationships between Plaintiffs and class members with their fertility specialists, and/or because of the nature of the services that Defendants undertake to perform: undertaking egg and embryo storage for those seeking to preserve the opportunity to become a parent.

84.     Defendants owed Plaintiffs and class members a duty of care, because their emotional harms occurred in the course of specified categories of activities, undertakings, or relationships in which negligent conduct is especially likely to cause serious emotional harm.  As PFC states in its marketing, fertility services, including frozen egg and embryo storage, can be highly stressful, overwhelming, and emotional, and thus PFC undertakes a "whole patient" treatment approach.

85.     It was reasonably foreseeable to Defendants that Plaintiffs and class members would experience severe emotional distress as a result of Defendants' mishandling their eggs and embryos, as Defendants market themselves as compassionate and understanding regarding the highly emotional aspect to fertility issues.

86.     Defendants' failure to appropriately handle and safeguard Plaintiffs and class members' eggs and embryos has caused severe emotional distress, regardless of whether it is ever determined conclusively that the eggs and embryos in Tank 4 are not viable, as Defendants' misconduct has irreparably breached trust and caused uncertainty, anxiety and fear over how to proceed with almost no information regarding the long-term effects, if any, from an egg or embryo's exposure to the unsafe conditions in Tank 4.

87.     There was a close connection between Defendants' conduct and Plaintiffs and class members' injuries; the harms occurred because Defendants' mishandled the eggs and embryos in their care.

88.     Plaintiffs and class members entrusted Defendants to use reasonable care to safeguard and preserve their eggs and embryos for the ultimate goal of becoming a parent. Defendants' carelessness with this precious material, and ultimately, with their patients' plans for parenthood, is morally blameworthy.

89.     Imposing a duty on Defendants would promote a policy of preventing future harm, insofar as they will be more incentivized to use tighter protocols and systems to ensure that eggs and embryos are properly handled going forward.

90.     The burden on Defendants by imposing this duty is only fair and appropriate, in light of the importance of the eggs and embryos they have voluntarily agreed to protect, and at considerable costs to Plaintiffs and class members.

91.     Imposing a duty to exercise care with resulting liability for breach furthers the community's interest in ensuring that high quality, reliable fertility services are available to those who desire to become parents.

92.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and class members have sustained and will continue to sustain severe emotional distress, including: suffering, anguish, fear, nervousness, grief, depression, anxiety, worry, shock, humiliation, and shame.  An ordinary, reasonable person would be unable to cope with the losses suffered by Plaintiffs and class members.

**THIRD CLAIM FOR RELIEF**
**Breach of Contract**

93.     Plaintiffs incorporate the above allegations by reference.

94.     Defendants entered into contracts with Plaintiffs and each of the other Class members, under which Defendants agreed to collect, store, and preserve their eggs or embryos.

95.     In consideration of Defendants' promises, including to keep the eggs and embryos safe and secure, Plaintiffs and class members agreed to pay, and did pay, substantial sums for the services rendered.

96.     Plaintiffs and class members performed all of the terms and conditions required of them under their contracts.

97.     Based on the conduct described herein, Defendants breached their contracts with Plaintiffs and class members.

98.     As a direct and proximate result of Defendants' breach of contract, Plaintiffs and class members suffered harm in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**Conversion**

99.     Plaintiffs incorporate the above allegations by reference.

100.     Plaintiffs and class members owned their eggs and embryos, which were placed in Defendants' care for the express purpose of safekeeping and storage until a time as Plaintiffs and class members directed otherwise.

101.     Plaintiffs and class members agreed to pay, and did pay, substantial sums in exchange for Defendants' promise to safeguard and store their eggs and embryos for the benefit of Plaintiffs and class members.

102.     As described above, Defendants converted the eggs and embryos by assuming control over them and harming the embryos and eggs by subjecting them to temperatures that damaged and destroyed them, or rendered their viability so uncertain as to render them practically destroyed, thereby depriving Plaintiffs and class members of their ownership over their property.

103.     As a direct and proximate result of Defendants' misconduct, Plaintiffs and class

1    members have been deprived of the opportunity to use the eggs and embryos they entrusted to

2    Defendants, and have suffered damages in an amount to be determined at trial.

3                              **FIFTH CLAIM FOR RELIEF**
                                        **Bailment**
4

5          104.    Plaintiffs incorporate the above allegations by reference.

6          105.    Plaintiffs and class members delivered to Defendants for safekeeping personal

7    property to be safely and securely kept for the benefit of Plaintiffs and class members, and to be

8    redelivered to them upon demand.

9          106.    Defendants received eggs and embryos from Plaintiffs and class members on this

10   condition.

11         107.    Plaintiffs and class members agreed to pay, and did pay, substantial sums in

12   exchange for Defendants' promise to safeguard their eggs and embryos for the benefit of

13   Plaintiffs and class members.

14         108.    Defendants had a duty to exercise care in maintaining, preserving, and protecting

15   Plaintiffs' and class members' eggs and embryos that were delivered to Defendants.  Further,

16   Defendants had a duty to return the eggs and embryos, undamaged, to the individuals to whom

17   they belonged.

18         109.    Defendants invited the general public, including Plaintiffs and class members, to

19   entrust eggs and embryos to Defendants' care by holding out Pacific Fertility Center as a

20   competent, capable, and established reproductive and storage facility able to handle and care for

21   eggs and embryos in a safe and satisfactory manner.

22         110.    Because of Defendants' wrongful conduct, as set forth herein, the property of

23   Plaintiffs and class members was irreplaceably damaged, precluding its redelivery to them as

24   provided for under the bailment contract.

25         111.    Defendants breached their duty to exercise care in the safekeeping of Plaintiffs'

26   and class members' eggs and embryos delivered to Defendants and to return the eggs and

27   embryos, undamaged, to Plaintiffs and class members.

28         112.    As a direct and proximate result of Defendants' breach of bailment contract,

1    Plaintiffs and class members have been deprived of the opportunity to use the eggs and embryos

2    they entrusted to Defendants, and have suffered damages in an amount to be determined at trial.

3                            **SIXTH CLAIM FOR RELIEF**
     **Violation of the Unfair Competition Law ("UCL"),**
4                      **Cal. Bus. & Prof. Code § 17200 *et seq.***

5           113.    Plaintiffs incorporate the above allegations by reference.

6           114.    The UCL prohibits acts of "unfair competition," including any "unlawful, unfair or

7    fraudulent business act or practice."

8           115.    Defendants' conduct set forth herein is unlawful because it constitutes negligence,

9    gross negligence, breach of contract, and conversion.

10          116.    Defendants' conduct is unfair because it is immoral, unethical, unscrupulous,

11   oppressive, and substantially injurious.  Plaintiffs and class members entrusted Defendants with

12   genetic material to preserve their ability to become a parent.  Defendants breached that trust by,

13   among other things:

14          a.      failing to adequately design, maintain, inspect, monitor, and/or test their

15   liquid nitrogen storage tanks, in accordance with industry standards, including through a

16   functional electronic tank monitoring system capable of detecting a rise in temperature or a drop

17   in liquid nitrogen levels and promptly alerting staff to the immediate problem;

18          b.      permitting a leakage or tank failure to occur from one of their liquid

19   nitrogen storage tanks containing human eggs and embryos;

20          c.      failing to have back-up alarm and generator systems;

21          d.      failing to properly safeguard the human reproductive tissue in its care; and

22          e.      failing to follow accepted scientific and laboratory procedures for

23   safeguarding the human reproductive tissue in its care.

24          117.    The gravity of the harm resulting from Defendants' conduct detailed above far

25   outweighs any conceivable utility of this conduct.  There are reasonably available alternatives that

26   would further Defendants' legitimate business interests, such as implementing reasonable

27   protocols and procedures, as promised, to prevent a catastrophic failure like the one that occurred

28   in Tank 4.

118.    Plaintiffs and class members could not have reasonably avoided injury from Defendants' unfair conduct.  Plaintiffs and class members did not know, and had no reasonable means of learning, that Defendants were not adequately safeguarding the human reproductive tissue in their custody and control.

119.    As a direct and proximate result of Defendants' unlawful and unfair conduct, Plaintiffs and class members have suffered injuries in fact and seek appropriate relief under the UCL, including injunctive relief and restitution.

**SEVENTH CLAIM FOR RELIEF**
**Premises Liability**

120.    Plaintiffs incorporate the above allegations by reference.

121.    At all times herein mentioned, Defendants Prelude and Pacific Fertility Center, owned, leased, occupied, and the property, premises, machinery, equipment including Tank 4 on the premises at 55 Francisco Street, Suite 500 in San Francisco, California.

122.    At all times herein mentioned, Defendants Prelude and Pacific Fertility Center had a duty to use reasonable care to keep Plaintiffs' and class members' personal property in a reasonably safe condition and free from defects that would cause injury or harm to the human tissue which was owned by Plaintiffs and class members.

123.    At all times herein mentioned, Defendants Prelude and Pacific Fertility Center, knew or should have known by reasonable inspection and monitoring of the defective condition of the premises, and specifically Tank 4.

124.    At all times herein mentioned, Defendants Prelude and Pacific Fertility Center, were careless and negligent in the ownership, management, control and maintenance of the above described real property, such that Plaintiffs' and class members' frozen eggs and embryos were caused to suffer permanent injury and damage.

125.    By reason of the premises, and as a direct and legal cause thereof, Plaintiffs and class members have been caused to suffer the injury, loss, harm, and damages hereinabove and hereinafter set forth.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the class defined above, respectfully request that the Court:

A.      Certify the Class under Fed. R. Civ. P 23(a), (b)(1), (b)(2), (b)(3), and/or (c)(4), as appropriate; appoint Plaintiffs as representatives of the Class; and appoint the undersigned counsel as Class counsel;

B.      Award Plaintiffs and class members compensatory, restitutionary, rescissory, general, consequential, punitive and/or exemplary damages in an amount to be determined at trial;

C.      Award prejudgment interest as permitted by law;

D.      Enter an injunction against Pacific Fertility Center and Prelude and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, to ensure Defendants' compliance with California Business & Professions Code sections 17200 *et seq.*;

E.      Enter an injunction against Pacific Fertility Center and Prelude and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, enjoining Defendants to cease engaging in unfair competition as set forth above;

F.      An order appointing a monitor to ensure Pacific Fertility Center and Prelude comply with the injunctive provisions of any decree that the Court orders;

G.      An order retaining jurisdiction over this action to ensure Pacific Fertility Center and Prelude comply with such a decree;

H.      Enter other appropriate equitable relief;

F.      Award reasonable attorneys' fees and costs, as provided for by law; and

G.      Grant such other and further relief as the Court deems just and proper.

1

## DEMAND FOR JURY TRIAL

2      Plaintiffs demand a trial by jury on all issues so triable.

3   Dated: April 17, 2018                Respectfully submitted,

4                                        By: _/s/ Sarah R. London_____
                                             Sarah R. London
5
                                         Elizabeth J. Cabraser (State Bar No. 083151)
6                                        *ecabraser@lchb.com*
                                         Lexi J. Hazam (State Bar No. 224457)
7                                        *lhazam@lchb.com*
                                         Sarah R. London (State Bar No. 267083)
8                                        *slondon@lchb.com*
                                         Tiseme G. Zegeye (State Bar No. 319927)
9                                        *tzegeye@lchb.com*
                                         LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
10                                       275 Battery Street, 29th Floor
                                         San Francisco, CA  94111-3339
11                                       Telephone:  415.956.1000
                                         Facsimile:  415.956.1008
12

13                                       *Attorneys for Plaintiffs A.B., C.D., E.F. and Proposed
                                         Class*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28